Employer-defendant is a wholesale distributor of produce in Wilmington, North Carolina. The employee-plaintiff went to work for the employer m mid-March 1996 as an operations manager. The plaintiff supervised, and sometimes assisted in, the unloading and storage of incoming produce shipments. He also supervised and assisted in the loading and dispatch of produce orders to the employer's customers, which generally were restaurants.
The incident that is the subject of this claim occurred on Saturday, May 4, 1996. The plaintiff was both supervising and participating in unloading produce from a truck at the employer's loading dock. The plaintiff's helper was co-employee Cory Sandlin. The truck driver was not assisting with the unloading.
The plaintiff and Mr. Sandlin were using a pallet jack, which works something like a manual forklift. The two prongs would be placed under the pallet, which could then be jacked up just high enough to allow the equipment to be rolled on its wheels out of the truck and into the employer's storage area.
When the incident occurred, the plaintiff and Mr. Sandlin were beginning to remove a pallet of produce from the truck with the plaintiff operating the jack, pulling the load and moving backward through the truck, toward the loading dock. Mr. Sandlin was on the other side of the loaded pallet, pushing.
Both the plaintiff and Mr. Sandlin recalled that the boxes of produce (broccoli, packed m ice) were stacked higher than either man's head and wider than either man's reach. As the two men reached the place where a metal ramp extended from the loading dock into the truck bed, a pallet jack wheel snagged or caught on the ramp's leading edge. The pallet jack stopped abruptly, and inertia caused a number of the produce boxes to tumble forward, away from Mr. Sandlin and toward the plaintiff.
The plaintiff testified that he strained to keep the boxes from falling but that they fell anyway, knocking him down on his lower back, which struck the metal loading ramp. Mr. Sandlin recalled an incident in which broccoli boxes fell on this date, but he did not recall seeing the plaintiff fall. However, he also testified that he could not see the plaintiff at all, because the pallet load was too tall and wide to see over or around.
The plaintiff testified that the fall was painful but that he was able to finish the afternoon's work. He did not work the next day, Sunday, and returned to work the following Monday, May 6. He then worked the entire next week, and during that week he communicated informally with the office manager, Virginia Powell, and other employees about his increasing back pain.
The following Monday, May 13, 1996, the plaintiff was experiencing pain in the lower back and left leg, and a burning sensation in the left leg. He left work and went to Southeastern Orthopedic Clinic, where his physician, Jon K Miller, M.D., is employed.
Dr. Miller had performed an L4-L5 laminotomy on the plaintiff in August 1994 and had released the plaintiff in October 1994 with no specific impairment; had he rated the plaintiff in 1994, Dr. Miller would have put the impairment of the back at "probably 5 percent or less." The plaintiff had not seen any health care professional about back pain or discomfort since October 1994.
On May 13, 1996, however, the plaintiff did not see Dr. Miller but instead saw a licensed physician's assistant, Armando P. Gonzalez. The office notes dictated by Mr. Gonzalez on that day indicate that the plaintiff had, on the previous Tuesday (May 7) "started noticing some increased pain along the lower back and . . . radiating down the left leg. . . . He states that there was no specific incident that precipitated the event but it just started getting progressively worse. . . ." The plaintiff was treated conservatively, with medication, moist heat and exercise, with a return in one week.
He did not return to work on Monday, May 13, or on either of the next two days. He returned to work on Thursday, May 16, and worked part of Friday, May 17, leaving early because of increased back pain.
During this week of May 13, the plaintiff made inquiry to the employer's office staff about the identity of the employer's Worker's Compensation career. A partial Form 19 was prepared by the employer on May 13.
By May 20, the date of the plaintiff s return appointment with Southeastern Orthopedic, he was unable to work. Dr. Miller prepared a note on that date stating, "Mr. Sholar may return to work, however, as tolerated only." By this time, The plaintiff could no longer tolerate work. Also on May 20, at the request of Jeff Stokley, owner and president of Employer-Defendant Saleeby Produce, the plaintiff submitted to a LabCorp urine test for the presence of narcotics, tranquilizers, amphetamines, cannabinoids and other impairing substances. The written report on the result of the screening indicated that the screening was negative for all such substances, and that the reason for the test was "post accident."
The plaintiff did not return to work for the employer after May 17, 1996.
The carrier-defendant took a tape-recorded statement from the plaintiff on May 31, 1996, and issued a Form 61 denial of the plaintiff's claim on June 5, 1996. The Form 61 states: "We have completed our investigation into your Worker's Compensation Claim."
The plaintiff's medical treatment continued, at first as a "private pay"' and then at the expense of N.C. Vocational Rehabilitation. An MRI in June 1997 revealed a disc herniation with an extruded fragment impinging on the L5 nerve root. On June 18, 1996, the plaintiff underwent a laminotomy and excision of the disc herniation at L4-5, and a bilateral mass arthrodesis, L4-5, with iliac crest graft at New Hanover Regional Medical Center, Wilmington. The plaintiff was discharged from the hospital on July 22, 1996.
The plaintiff's recovery from surgery was uneventful. In 1997, he went into real estate sales and has been employed by a Wilmington real estate firm. At the time of his deposition, Dr. Miller had no opinion with respect to the plaintiff's disability rating because at that time less than a year had elapsed since the plaintiff's disc surgery.
The plaintiff testified that his lower back and radiculapathy problems began a recurrence, albeit a mild one, on May 4, 1996. He began at that time to take over-the-counter analgesics for the pain. Over the next nine days there was a gradual worsening of the pain. The majority correctly found from the evidence that the plaintiff had had, in 1994, a herniated disc of the lumbar spine, at L4-L5. Dr. Miller performed a laminotomy and disc excision on the plaintiff on August 23, 1994. The plaintiff continued seeking treatment from Dr. Miller through October 1994.
After the surgery, Dr. Miller found that the plaintiff had no specific impairments on his discharge from the doctor's care on October 18, 1994. If rated, the plaintiff would have had a rating of 5 percent or less. Dr. Miller did not personally see the plaintiff again until June 14, 1996. The plaintiff had sought no medical attention from anyone for back problems from October 1994 until May 1996. The only possible exception was a telephone call to Dr. Miller's office staff on July 11 1995, about leg cramps. The plaintiff was advised to see Dr. Miller or another doctor; no drugs or other treatment was prescribed.
The plaintiff did physically vigorous work for the defendant from mid February until early May 1996 without apparent difficulty, and without a need for medical intervention. After his injury on May 4, 1996, the plaintiff saw only one medical doctor: Dr. Miller. It is Dr. Miller's opinion that the plaintiff suffered after May 1994 from a recurrence of the herniation of the disc at L4-L5 and that the cause of the herniation was a "flexion injury to his back, not a fall."
When the plaintiff returned to Dr. Miller's office on May 13, 1996, he completed a questionnaire in which he wrote short answers and checked various appropriate places on the form. The check marks on page 1 of the questionnaire indicate that the plaintiff had a problem with his back and leg, that began suddenly at work, "during or after lifting/bending" The plaintiff did not mark places to indicate that the problem began "when I fell," "at the time of the accident," "after the accident," "for no apparent reason," or "other."
The plaintiff completed this questionnaire at a time of severe pain, which he rated at a 9 on a scale of 1-10. When he reached the section asking him when the problem began, he had several choices that would have been, in retrospect, "consistent" with his testimony at the hearing, and only one that would have been inconsistent. That one would have been "for no apparent reason."
The plaintiff testified that he fell after a day of lifting and bending. He problem was mild at the time of and immediately after the accident, but became severe some nine days later. To select and check one of the truthful statements available to him was not "inconsistent" with his testimony.
Likewise, the plaintiff's pro se filing of a Form 18 indicated that his May 4, 1996, accident was caused by "lifting and pulling on produce." Any reading of the plaintiff's testimony is that he was, at the time the broccoli boxes fell (which the defendant's eye-witness confirmed), lifting and pulling on a pallet jack to move iced broccoli from a truck into the defendant's warehouse.
A lawyer who completes the causation line of a Form 18 is trained to think in terms of the proximate cause of an injury, weeding out preliminary causes in fact. The plaintiff is not a lawyer, however, and wrote on the causation line a truthful statement of what he was doing when the broccoli boxes fell: he was "lifting and pulling on produce." Had he not been pulling the pallet jack, the incident of May 4, 1996, would not have occurred.
The plaintiff's Form 18, therefore, may not have been a complete statement of proximate cause, but it was a truthful statement of a cause in fact of his accident that was not in any way "inconsistent" with his testimony.
The confusion that has resulted from the plaintiff's interview with Dr. Miller's physician's assistant evolves from a conflict of points of view. The plaintiff was in the doctor's office with one point of view foremost in his mind, whereas the notes from that office visit were read later with a differing point of view.
The plaintiff testified that he had mild pain, controllable with non-prescription analgesics after the incident of May 4, 1996. The problem began getting progressively worse, until it became severe enough to see a doctor. When he saw the physician's assistant, he spoke of a progressive worsening since the preceding Tuesday. There had been no traumatic incident on the preceding Tuesday; the incident had been on the Saturday nine days earlier. And the physician's assistant confirmed at his deposition that the plaintiff's reference to "getting progressively worse" was in fact a reference to the preceding week.
It is entirely consistent with the plaintiff's effort to explain why he was in the doctor's office on May 13 to refer to the beginning of pain severe enough to seek medical help, which had been over the course of the preceding week. The statements to the physician's assistant are not "inconsistent" with testimony on a specific traumatic incident on May 4 that by the middle of the next week had become so "progressively worse" that it caused the plaintiff to go to the doctor.
The Deputy and the majority rely in part on an "inconsistency" between the plaintiff's testimony and the testimony of the plaintiff's helper on May 4, 1996, Corey Sandlin. However, it appears that their testimony is consistent on material points. Both recall unloading broccoli boxes. Both recall that a pallet load of broccoli boxes fell. Both recall that the boxes were stacked at least 7 feet high.
The plaintiff testified to being knocked down by the falling broccoli boxes. Mr. Sandlin testified either that he did not remember or recall a fall by the plaintiff. He did not testify to recalling the contrary. Instead, he testified as to an inability to see the plaintiff through the boxes of broccoli. He could not recall because he was in no position to observe. He was, in fact, incompetent to testify as to what happened to the plaintiff when the boxes on the plaintiff's side of the load fell.
This witness' testimony was not "inconsistent" with the plaintiff's testimony.
A compensable injury under the Worker's Compensation Act is one that was suffered by "accident," that arose out of employment and that occurred in the course of employment. Gallimore v.Marilvn's Shoes. 292 N.C. 399, 233 S.E.2d 529 (1977).
Also, when injury to the back arises out of and in the course of employment, and is the direct result of a specific traumatic incident of the work assigned, "injury by accident" includes any disabling physical injury to the back arising out of and causally related to the traumatic incident. N.C. Gen. Stat. § 97-2(6).
In the present case, the plaintiff's evidence has shown that the falling of the boxes, laden with iced broccoli, on May 4, 1996, was the requisite unexpected disruption of the plaintiff's normal work routine as operations manager, so as to constitute an "accident" as defined under the Act. The plaintiff's case does not need the broader standard of N.C. Gen. Stat. § 97-2(6). Whether the plaintiff suffered injury by falling at this time, as he recalls, or by flexion injury, as his treating physician opines, does not negate the fact of something specific happening to the plaintiff on May 4, 1997. With 20/20 hindsight, the plaintiff might better have linked his various reports and complaints at the time. But after an accident that results in mild pain progressing to severe pain, with relief rather than litigation the goal, the paper trail does not appear to have been fraught with the fatal inconsistencies referred to by the Opinion and Award in this case.
Plaintiff suffered a compensable injury by accident to hislower back on May 4, 1996; he provided appropriate notice of theinjury; his herniated disc was caused by the compensable injury ofMay 4, 1996; the subsequent surgery was reasonably necessary toeffect a cure, give relief and lessen the disability from theinjury; and he is entitled to medical compensation and wage-losscompensation under the North Carolina Workers' Compensation Act.
Although the Deputy Commissioner was in a better position to observe the demeanor of the witness, his credibility findings were not based on demeanor but rather on supposed inconsistency which, upon a careful review of the "cold" documentary evidence (the same evidence reviewed by the Deputy) simply is not inconsistent. All of the facts point to the conclusion that this was a compensable injury.
This 26th day of August 1998.
 S/ _______________________ THOMAS J. BOLCH COMMISSIONER